**RAILROAD COMMISSION et al. v. MARATHON OIL CO. et al.**

No. 8370.

Court of Civil Appeals of Texas. Austin.

Dec. 16, 1935.

Rehearing Denied Jan. 8, 1936.

Felts & Wheeler and Claude Pollard, all of Austin, and W. T. Saye, of Longview, for appellants.

Thos. R. Freeman, of Dallas, C. M. Abney, of Marshall, and Jno. W. Stayton, and Black & Graves, all of Austin, for appellees.

McCLENDON, Chief Justice.

Appeal from a final judgment setting aside an order of the Railroad Commission granting to Adams, one of the appellants, a permit to drill a fourth well upon a 10-acre tract in the East Texas oil field, as an exception to spacing rule 37.

Adams' first application was made early in January, 1935, and, after notice and hearing, was denied January 23d. He then filed an application for rehearing, which was heard by the chief supervisor of the oil and gas division on February 14th, who reported to the commission on February 19th as follows: "The evidence disclosed that there has not been sufficient change in conditions surrounding this lease since the application was formerly denied by the Commission to justify me in recommending the well."

The commission, however, granted the application on March 8, 1935, "to prevent confiscation"; the well to be spaced "as a direct and equidistant west offset to Petroleum Marketing Corporation's No. 2, J. E. Arnold, and being 66 feet from the east line of applicant's lease."

The 10 acres in question is rectangular in form, 472 feet wide (east to west) and 922 feet long (north to south). The petroleum tract borders it on the east. It is a strip 180 feet wide and 2,304 feet long. Its west line extends 1,382 feet north of the northeast corner of the 10 acres. There are three wells on the 10 acres, spaced as follows: The northerly (No. 2) 145 feet south of the north line and 222 feet west of the east line; the central (No. 3), 316 feet south of No. 2 and 254 feet west of the east line; the southerly (No. 1) 150 feet north of the south line, 311 feet south of No. 3 and 232 feet west of the east line. The petroleum tract, which contains approximately 7.2 acres, has two wells; No. 1 in the extreme north (210 feet south of the north line), and No. 2, 450 feet north of the south line and 66 feet east of the west line, being the east line of the 10 acres. This well is practically due east of the Adams No. 3. The Adams No. 4 here involved was authorized to be located 66 feet west of the property line and 133 feet west of the petroleum No. 2. It will thus be seen that whatever advantage the petroleum No. 2 has over Adams No. 3 is more than offset by the Adams Nos. 1 and 2. From the standpoint of density, the 10 acres have an advantage over all adjacent tracts.

The following is from the report of the oil and gas division examiner who conducted the first hearing of the application, resulting in its denial by the commission:

"The location is requested as a direct and equidistant offset to Petroleum Marketing Corporation No. 2 Arnold, granted in Case No. 5815. The Petroleum Marketing lease is a long narrow strip only 180 feet wide, and applicants' lease extends about 1/3rd the length of the Petroleum Marketing lease. The applicant has three wells ranging from 222 feet to 254 feet from the common line while Petroleum Marketing has one well within 66 feet of the common line. Petroleum Marketing Corp., requested three additional wells on this strip, two of them to offset this applicant's wells, and all of those applications were denied by the Commission. The protestants called attention to the fact that the applicant's No. 3 was drilled after the Petroleum Marketing No. 1 well was in and applicant then had his choice of where he chose to offset it.

"It appears to me that the applicant, with three wells within an average distance of 236 feet of the east line, now has an equal opportunity to secure the same amount of oil as the offset leases. I do not believe this fourth well is justified and recommend that the permit be denied."

The record conclusively shows that with the three wells Adams has at least an equal opportunity, to that of all adjacent tracts, to extract his fair share of the oil in place under his land. In this regard the case is on all fours with Atlantic Oil Production Co. v. Railroad Commission, 85 S. W.(2d) 655, 657, wherein we said: "The undisputed evidence negatives any substantial inequality or disparity between appellee's and the surrounding properties. The record therefore affords no basis for an exception to the rule, and the commission exceeded its powers in granting it. Sun Co. Case [Sun Oil Co. v. Railroad Commission (Tex.Civ.App.) 68 S.W.(2d) 609, affirmed Bennett v. Sun Oil Co. (Tex.Sup.) 84 S.W.(2d) 693]; Humble O. & R. Co. v. Railroad Commission (Tex.Civ.App.) 68 S.W.(2d) 622, affirmed [Brown v. Humble O. & R. Co.] (Tex.Sup.) 83 S.W.(2d) 935 [99 A.L.R. 1107]; Humble O. & R. Co. v. Railroad Commission (Tex.Civ.App.) 68 S. W.(2d) 625; Smith v. Stewart (Tex.Civ. App.) 68 S.W.(2d) 627, affirmed (Tex.Sup.) 83 S.W.(2d) 945."

The only theory advanced in support of the commission's order is embodied in the testimony of the Geologist Hudnall, to the effect that the drilling of the Adams No. 4 would result in the ultimate recovery of a greater proportion of the recoverable oil from the tract. This was based upon the theory that, "in general with the closer spacing of wells and the more densely the wells are drilled, the higher will be the per-

centage of recovery in the East Texas oil field." The effect of his testimony is summed up in the following question to which he gave an unqualified affirmative answer: "Based upon that theory, Mr. Hudnall, of course the Railroad Commission would have to grant every application that is presented to the Railroad Commission for the drilling of additional wells, if it were the law that an applicant would be entitled to a well every time he could show that if he did not get the permit that there would be some oil left in the ground that he could recover through that well?"

It is stated in appellants' brief that the commission, after an extensive hearing, made the following findings on August 26, 1935:

"We further find from the evidence the more wells that are drilled the greater will be the ultimate recovery of oil or gas from any given pool.

"The hearing just closed raises grave doubts as to the wisdom or value of any Rule 37 in preventing waste or in aid of the recovery of oil, except in the instances of certain new fields, and then only as a prevention of fire hazards and blowout dangers."

In the last analysis the position of appellant resolves itself into an attack upon the validity of rule 37, although under the guise of an application for a permit as an exception to the rule.

Rule 37 was originally passed in 1919. It has been upheld and enforced by every court in which its validity or rights under it have been brought in question; beginning with the Oxford Oil Co. Case in the federal court [Oxford Oil Co. v. Atlantic Oil & Producing Co. (D.C.) 16 F.(2d) 639; Oxford Oil Co. v. Atlantic Oil Producing Co. (C.C.A.) 22 F.(2d) 597, writ of certiorari denied 277 U.S. 585, 48 S.Ct. 433, 72 L.Ed. 1000], and the Bass Case [Railroad Commission v. Bass (Tex.Civ.App.) 10 S.W. (2d) 586] in the state courts. See, also, the recent Supreme Court case of Brown v. Humble Oil & Refining Co., 83 S.W.(2d) 935, 99 A.L.R. 1107.

In Atlantic Oil Production Co. v. Railroad Commission, supra, we said: "It has been judicially determined by this court that the 660–330 feet spacing rule (37) in the East Texas field, 'promulgated after an extensive hearing,' was in effect an authoritative official finding by the commission that 'wells in closer proximity producing equally would tend to create waste.' Sun Oil Co. v. Railroad Commission (Tex.Civ.App.) 68 S. W.(2d) 609, affirmed [Bennett v. Sun Oil Co.] (Tex.Sup.) 84 S.W.(2d) 693."

It is but to reiterate an elementary principle to aver that orders of the commission, within its delegated authority, are immune from collateral attack, unless they appear to be void on their face. Otherwise their validity is conclusively presumed, unless brought in question in a direct proceeding instituted for that purpose under statutory authority. Railroad Commission v. Weld & Neville, 96 Tex. 394, 73 S.W. 529; Alpha Pet. Co. v. Terrell, 122 Tex. 257, 59 S. W.(2d) 364, 365, 59 S.W.(2d) 372; Missouri-Kansas & T. R. Co. v. Railroad Commission (Tex.Civ.App.) 3 S.W.(2d) 489, affirmed Producers' Refining Co. v. Missouri, K. & T. R. Co. (Tex.Com.App.) 13 S.W. (2d) 679; Houston Chamber of Commerce v. Railroad Commission (Tex.Civ.App.) 19 S.W.(2d) 583, affirmed 124 Tex. 375, 78 S. W.(2d) 591; Magnolia Pet. Co. v. Edgar (Tex.Civ.App.) 62 S.W.(2d) 359, and numerous other cases cited in these opinions.

With the wisdom or policy of rule 37 the courts are not concerned. These are issues which address themselves exclusively to the Railroad Commission, whose action is subject to review by the courts only in a direct proceeding, and then only to determine whether its action has reasonable factual basis for its support. The resolving of divergent conclusions arrived at from conflicting theories and opinions of experts are issues solely within the commission's jurisdiction. See Brown v. Humble Oil & Refining Co. (Tex.Sup.) 83 S.W.(2d) 935, 99 A.L.R. 1107, on rehearing (Tex.Sup.) 87 S.W.(2d) 1069; Danciger Oil & Refining Co. v. Railroad Commission (Tex.Civ.App.) 49 S.W.(2d) 837.

The commission has the power to modify, amend, or even abrogate the rule (37), whenever, in its judgment, this should be done in the interest of a proper administration of the conservation laws of the state. But until such action, or until the rule is set aside in a direct proceeding instituted for that purpose, it is the imperative duty of the courts to enforce it, notwithstanding any expression of doubt on the part of the commission as to its wisdom, propriety, or effectiveness to accomplish its objective.

The trial court's judgment is affirmed.

Affirmed.