**STANOLIND OIL & GAS CO. v. MIDAS OIL CO. et al.**

No. 8635.

Court of Civil Appeals of Texas. Austin.
May 25, 1938.

Motions for Rehearing Granted in Part and
in Part Overruled Nov. 30, 1938.

Further Motion for Rehearing Overruled
Dec. 21, 1938.

Dissenting Opinion Jan. 19, 1939.

Turner, Rodgers & Winn, F. J. Scurlock, and W. W. Prior, all of Dallas (Clay Tallman and Donald Campbell, both of Tulsa, Okl., of counsel), for appellant.

Carl W. Wade and E. S. McCord, both of Dallas, for appellees Midas Oil Co. and others.

Wm. McCraw, Atty. Gen., and Chas. D. Rutta, Asst. Atty. Gen. (Harry S. Pollard, of Austin, of counsel), for appellee Railroad Commission.

BAUGH, Justice.

This is a rule 37 case. Appeal is from a judgment of the District Court, based upon an instructed verdict, sustaining the validity of a permit granted to the Midas Oil Company to drill a second well on 2.14 acres of land in the East Texas oil field in Gregg County, being a strip about 1200 feet long and about 70 feet wide. In January, 1935, the Midas Oil Company, which then had one producing well on said strip located approximately 500 feet from the east end thereof, applied to the Commission for permits for two additional wells thereon. After hearing the Commission refused to grant this application. Upon motion for rehearing the Commission granted the permit here involved for one additional well on said strip located 200 feet east of its well No. 1. The application was made on the grounds that the wells were necessary to prevent confiscation of property and the order granting it recited that it was granted on that ground.

The grounds of attack on the permit were that the additional well would cause waste; that without it there would be no confiscation of appellee's property; and that the tract in question had been subdivided in 1931 after rule 37 became applicable to the field.

Two questions are presented on this appeal: First, whether appellant was such "interested person affected by the conservation laws" and the orders of the Commission within the meaning of Sec. 8, Art. 6049c, Vernon's Texas Civil Stats., as amended, as would authorize it to bring the suit; and, second, whether it discharged the burden of proof resting upon it to rebut the presumptive validity of the Commission's order.

The appellee Midas Oil Company relies primarily upon, and devotes most of its brief to, the first question. This contention is predicated upon the following facts: The last hearing before the Commission was had on May 22, 1935, and the permit granted on June 10, 1935. On these dates, and long prior thereto the adjacent lease to the north of this tract was owned by the Yount-Lee Oil Company, which protested before the Commission the granting of the permit, but did not file suit to set it aside after it was granted. On July 31, 1935, the Yount-Lee Oil Company assigned this lease to Wright Morrow, who, on the same day, assigned it to appellant which has owned it continuously since. On October 19, 1935, more than four months after the permit was granted, appellant filed this suit to set it aside.

It is the position of appellee that only those who were "parties" to the proceedings before the Commission come within the purview of Art. 6049c, § 8, and are authorized to attack the permit so granted, relying particularly on the cases of Southern Surety Co. v. Arter, Tex.Com.App., 44 S.W.2d 913, and Allied Drug Prod. Co. v. Seale, Tex.Com.App., 49 S.W.2d 704. The latter case involved the question of the right of appeal from an order of the District Court by one who was not a party to a judicial proceeding in that court; which right he was denied because he was not a "party" to the suit. Manifestly the

case is not applicable here. A suit attacking an order of the Commission is not an appeal from such order as if it were a judgment of a court of competent jurisdiction; nor is it merely a review of the proceedings had before the Commission. While often referred to as a statutory appeal, it is in reality an original suit in the trial court, to be tried as other civil suits, de novo in character, and not confined to, nor a mere review of, the proceedings before the Commission. Of course, the Commission must first act in the premises, and comply with the requirements of the statutes relating to such hearings, but the suit to test the validity of its orders, when instituted in the District Court, is an original proceeding in that court, and not an appeal in a judicial sense.

While we think there is no analogy between the statute authorizing "any interested person affected" to attack by suit a permit to drill an oil well, and the provisions of the Workmen's Compensation Act (art. 8307, § 5, Vernon's Ann.Civ.St.), which latter act was involved in the Arter Case, supra; even if they be deemed analogous so far as the proceedings before the Industrial Accident Board and the Railroad Commission are concerned, the holding of the Commission of Appeals in the Arter Case would seem to reject rather than sustain appellee's contention here. The provision of Sec. 5 of Art. 8307 is that "any interested party" may, under the provisions of the Act, bring suit to set aside the Board's order; and further that if "any party to any such final ruling" shall fail within the specified time to bring such suit, then that the ruling shall be binding "upon all parties thereto, etc." Judge Leddy in the Arter Case gave special significance to the use of the word "party" in the Workmen's Compensation Act as limiting such suit to those who were parties to the hearing before the Board. In discussing the meaning of the language of that Act in using the term "party" and in disposing of the contention that the term "interested" extended the right to sue to others, Judge Leddy used the following significant language: "If such had been the intention, the law-making body would doubtless have granted the right of appeal to any 'person interested,' and required the interest of the party attempting an appeal to be disclosed, as it did in making provision for a review by the district court of judgments of the probate court entered in administering the estates of decedents." 44 S.W.2d 916.

That is the term the Legislature did use in Sec. 8 of Art. 6049c. Not only is this true, but there is a manifest difference between the subject-matter of Art. 8307 and that of Art. 6049c. In the former, the rights granted to the employee for compensation are personal to him. Whereas, under Art. 6049c the rights involved, and subject to suit in an attack upon the Commission's order, are not personal, but the suit so authorized is for the protection of the adjacent properties against drainage, confiscation, or damage, irrespective of ownership. The mere fact that the ownership of such property changes hands after the hearing before the Commission has no bearing whatever on the character, extent, or nature of the injuries, if any, which result thereto by virtue of the Commission's order. These are the matters which the Legislature intended to protect, and the ownership thereof whether acquired before or after the Commission's order is made, is, we think, but incidental so long as the owner of the property affected seasonably acts under the statute. We conclude, therefore, that the District Court had jurisdiction to try these issues in the suit brought by the Stanolind Oil Company.

It is not amiss to here observe that grave injustice may be done to the holder of a permit, prima facie valid, who has proceeded thereunder to drill a well at heavy expense, by unreasonable delay of the adjacent property owner in filing a suit to set it aside. In the instant case the delay in filing this suit was more than four months after the permit was granted. Meantime appellee had drilled the well and same had been producing oil prior to the filing of this suit. Where a permit granted to prevent confiscation is held to be invalid it is manifest that in such cases injustice is done the holder thereof by such delay in attacking it. Justice and fair dealing would, it seems, be better subserved by requiring a dissatisfied person to give notice to the holder thereof that such suit would be filed before such holder incurs a heavy expenditure thereunder in good faith; and by requiring such suit to be filed within a limited time as the statute does in workmen's compensation cases. That, however, is a matter for legislative determination, and as yet no such limitations have been made in the conservation laws.

We come therefore to the waste and confiscation issues. The uncontradicted

evidence shows that over the area surrounding the well here in controversy the conditions as to sand thickness, porosity, permeability, bottom hole pressure, daily allowable and hourly potential of wells were practically uniform. The records of the Railroad Commission introduced in evidence showed that the hourly potential of the wells on this tract and the surrounding tracts—23 wells shown—ran from 810 to 830 barrels per hour; and that the allowable per well per day was approximately the same. The record also shows that in 1931 after rule 37 became applicable to the field there was segregated from this 2.14-acre strip another strip containing only .62 of an acre on which a well had been drilled. That is, applying the rule announced in Railroad Commission of Texas v. Magnolia Pet. Co., Century Case, 130 Tex. 484, 109 S.W.2d 967, as to voluntary subdivisions, and treating the aggregate 2.76-acre tract as it existed prior thereto as a unit, the 2.76 acres already had 2 wells thereon without the well here involved, as against an average density of surrounding leases of 1 well to a much greater acreage; that with 2 wells on said 2.76 acres it was, under the allowable, producing daily much more oil per acre than adjacent leases. That wells to the east of the tract here involved were draining oil from beneath the east end of the Midas tract, and some to the south thereof were doing likewise, but these wells were located farther from the boundary lines of the 2.76-acre tract than its wells were from the lines of the adjacent leases; and that whatever drainage existed from the 2.76-acre tract was being compensated by drainage to its wells from other directions. It affirmatively appears, therefore, that no confiscation resulted, and that the permit is not sustainable on that ground.

On the issue of waste, other than the record evidence, only one witness testified. He was offered by appellant as an expert petroleum engineer, and his general qualifications to testify as such admitted by the Railroad Commission. He testified that from tests made by him in this area, including corings of wells, sand thickness, porosity, permeability, bottom hole pressure of wells, the distance a key well at open flow would affect the bottom hole pressure in wells not producing, showing migratory movement of oil at a distance of from 1000 to 1500 feet away from a flowing well; that under proration, wells were permitted to flow from 30 minutes to one hour; and that during the 23 or 23½ hours they remained closed the oil level and bottom hole pressure adjusted itself over a large area. In brief, the evidence showed that no unusual or exceptional conditions obtained in this area distinguishing it from conditions common to the pool which, in themselves, would warrant the Commission to depart from the general rule in granting an exception to prevent waste. We do not understand appellee to contend that waste would not result from the drilling and operation of the additional well; and certainly there is no affirmative evidence to that effect. Appellee rather, on this question, relies upon the holding in the Century Case, supra, and contends that appellant did not prove that waste would result from the increased density and concentrated drilling in this vicinity brought about by the well here involved.

Much confusion and uncertainty as to the force and effect of rule 37, and the grounds on which exceptions thereto are authorized, have been caused by the recitals of the order of the Commission, dated August 26, 1935, that—

"We further find from the evidence the more wells that are drilled the greater will be the ultimate recovery of oil and gas from any given pool.

"The hearing just closed raises grave doubts as to the wisdom or value of any Rule 37 in preventing waste or in aid of the recovery of oil, except in the instances of certain new fields, and then only as a prevention of fire hazards and blowout dangers." See Railroad Com. v. Marathon Oil Co., Tex.Civ.App., 89 S.W.2d 517, 519.

This action of the Commission was, in effect, an attack by the Commission itself on the wisdom or efficacy of its own published rule as a waste prevention measure when applied to the East Texas field. Manifestly unless there is a reasonable relationship between the spacing distances prescribed in rule 37 and the prevention of waste—that is, that the prescribed spacings are in general required to prevent waste—then the rule is without factual basis to sustain it, and is invalid as a conservation measure. The Commission itself, in its order of September 2, 1931, increasing the spacing distances as applied to the East Texas field, stated as the basis for doing so that the increased distances were made "in the interest of preventing actual physical waste of oil and gas," etc.

See Tide Water Assoc. Oil Co. v. Railroad Com., Tex.Civ.App., 120 S.W.2d 544, decided May 18, 1935. The contention is made that the recital above quoted of the order of August 26, 1935, amounts to an official finding by the Commission against the efficacy of the spacing provisions of the rule. Notwithstanding the above quoted recital, however, the Commission has not amended nor modified these spacing provisions of the rule itself; and obviously realizing that such above quoted recitals, taken alone and if considered as an official finding, probably operated to nullify the rule unless the spacings then provided by the rule were reduced, the Commission in its order of February 4, 1936, in effect repudiated the recital of its order of August 26, 1935, in the following language (See Magnolia Pet. Co. v. Railroad Com., Tex.Civ.App., 93 S.W.2d 587, 588):

"By this language the Commission did not mean and did not find from the evidence that the closer wells are drilled the greater will be the ultimate recovery of oil and gas from any given pool, but by such language only meant and found from the evidence that the more wells that are drilled in conformity with the spacing rules as applicable to the various fields in Texas the greater will be the ultimate recovery of oil and/or gas from any given pool.

"It was not then the intention and it is not now the intention of the Railroad Commission to abrogate or abandon any of the spacing rules now in effect and applicable to the various oil and gas fields in Texas, nor to militate against the fact basis on which the Commission's spacing rules are based."

The writer interprets the above as a repudiation by the Commission itself of the so-called finding of August 25, 1935, and a reaffirmation of "the fact basis on which the Commission's spacing rules are based." This fact basis was recited, in the order of September 2, 1931, as the reason for increasing the spacing distances in the East Texas field from 150–300 to 330–660 feet, to be to prevent "actual physical waste of oil and gas." That is the extent of the power vested in the Commission by the Legislature. See Arts. 6014 and 6029, R.C.S., as amended, Vernon's Ann.Civ.St. arts. 6014 and 6029. If there be no reasonable relationship, therefore, between the spacing provisions of the rule and the prevention of waste, such spacings become purely arbitrary, and the Commission has exceeded its authority in prescribing them. The validity of the rule has been repeatedly upheld. The very term "exception" thereto necessarily implies a deviation or departure from the general rule. If an exception be necessary to prevent waste, the necessary implication is that facts exist which make inapplicable the general spacing rule. That is, that underground conditions, e. g., sand thickness, saturation, porosity, permeability, well potentials, bottom hole pressure, and drainage in the area of the particular well, differ from those obtaining generally, and on which the rule itself is predicated. Under these facts and circumstances we concluded, in construing the rule and its application to the granting of permits as exceptions thereto that the spacing provisions of rule 37 constituted an official finding by the Commission that wells spaced at lesser distances than prescribed by the rule, producing equally, where uniform underground conditions prevail, tended to create waste. Sun Oil Co. v. Railroad Comm., Tex.Civ.App., 68 S.W.2d 609, 612; Atlantic Oil Prod. Co. v. Railroad Comm., Tex.Civ.App., 85 S.W. 2d 655; Arkansas Fuel Oil Co. v. Reprimo Oil Co., Tex.Civ.App., 91 S.W.2d 381; Magnolia Pet. Co. v. Railroad Comm., Tex. Civ.App., 93 S.W.2d 587, writ ref.; Magnolia Pet. Co. v. Railroad Comm., Century Case, Tex.Civ.App., 105 S.W.2d 787. In the case last above cited the Supreme Court granted a writ of error and the opinion of that court appears in 130 Tex. 484, 109 S.W.2d 967. We find nothing in the decision of the Supreme Court overruling the conclusion, above stated, originally reached by us in the Sun Oil Company Case, supra, consistently adhered to by the majority opinions of this court, and reiterated in cases wherein the Supreme Court has refused writs of error. On the other hand, our judgment in the Century Case, was reversed by the Supreme Court, not because we had announced and followed an erroneous rule of law; but on the ground we had misapplied the rule originally announced by us to the facts of that case. The question of what would be prima facie evidence of waste was not discussed nor considered by the Supreme Court in the Century Case. The permit was upheld by the Supreme Court in that case on the ground that it was authorized to prevent confiscation, treating the small tract so segregated as a part of the larger tract, thus showing a lesser density on the

combined tract as a whole than existed on adjacent surrounding tracts.

 The exceptions authorized have been uniformly deemed to be a part of the rule; but that they are in derogation of its general spacing provision was manifestly recognized by the Supreme Court in the Century Case in its holding that when applied for the burden rested upon the applicant to show that he was legally entitled to such an exception,—that is, that same was necessary to prevent confiscation or to prevent waste. If he failed to show either ground, no such exception would be authorized. In the instant case no confiscation was shown. On the contrary it was negatived. After the permit was granted, the burden then shifted to the contestant to show that waste would result from the drilling and operation of such well. That as we interpret the Supreme Court's opinion in the Century Case, is the extent of its holding on this question. Absent affirmative evidence to show that waste would result unless the permit were granted, the validity of the permit on that ground has only the presumption given by statute to sustain it. And when the contestant made proof that no underground conditions obtained in this area which would differentiate the tract in question from the surrounding area; in brief, that no conditions existed which would afford a factual basis for an exception to the general rule to prevent waste, we think appellant rebutted the presumption in favor of the validity order; and, absent any other evidence to the contrary, made prima facie proof, under the rule itself, and our repeated interpretations of it, that the drilling and operation of such well would tend to cause, rather than to prevent, waste.

The appellee's property when considered together with that segregated from it subsequent to the time rule 37 became applicable to it, showed a tract of 2.76 acres with 2 wells thereon, not including the well here involved, a per acre density much greater than surrounding tracts; that under the circumstances the wells already thereon afforded opportunity to recover an amount of oil equal, if not in fact much greater, than the quantity of oil originally in place beneath such tract. That being true no confiscation resulted. Under the record presented we conclude that the permit granted cannot be sustained.

The judgment of the trial court is therefore reversed, the permit attacked declared invalid, and the cause remanded to the trial court to grant such ancillary relief as may be appropriate in the premises.

Reversed and remanded.

BLAIR, J., dissents.

On Motions for Rehearing.

BAUGH, Justice.

Since the trial court rendered judgment in favor of appellees at the close of appellant's evidence, no evidence was introduced by appellees, and it does not affirmatively appear that the case was fully developed, we have concluded that our former judgment setting aside said permit as invalid should be set aside, and the cause reversed and remanded, rather than rendered as to the validity of said permit. The motions for rehearing are therefore to that extent granted. In all other respects they are overruled.

Granted in part and in part overruled.

BLAIR, Justice (dissenting).

The writer dissents from the majority view holding that appellant, Stanolind Oil & Gas Company, is an "interested party affected" by the order granting the permit to drill the well in question and entitled to prosecute this proceeding under Sec. 8 of Art. 6049c, as amended by the Acts of the 42nd Legislature, 4th C.S., Chap. 2, Sec. 8, Vernon's Ann.Civ.St. art. 6049c, § 8. Stanolind was not the owner of the oil lease on the adjoining tract when the permit to drill the well was granted. Yount Lee Oil Company owned the lease on said adjacent tract of land. It had notice of the application of appellee Midas Oil Company to drill the oil well, and appeared and contested it; and after a full hearing the Commission granted the permit to drill the well on June 10, 1935. Yount Lee Oil Company did not appeal from the order granting the permit, but on July 31, 1935, assigned its lease to Wright Morrow, who on the same date assigned it to Stanolind, who on October 13, 1935, more than four months after the permit was granted, filed this proceeding seeking to set aside the order granting the permit to drill the oil well.

Apparently the trial court held that since Stanolind was not the owner of the adjoining oil lease when the permit was granted, it is not an "interested person affected" by the order within the meaning of that term as used in the statute giving such "interest-

ed person" the right to appeal therefrom. Such interpretation seems to be in accord with cases generally construing similar statutes, holding that an "interested party" or "interested person", as regards a judgment of a court or an order of an administrative board, is one who is interested at the time the judgment is rendered, or the order is made. Southern Surety Co. v. Arter, Tex. Com.App., 44 S.W.2d 913; Texas Motor Coaches v. R. R. Comm., Tex.Civ.App., 41 S.W.2d 1074. To the same effect have been the decisions construing who is an "interested party" under the Workmen's Compensation Law, which by analogy is similar to the above appeal statute in all respects. Allied Drug Prod. Co. v. Seale, Tex.Com. App., 49 S.W.2d 704, 705; Collier v. New Amsterdam Casualty Co., Tex.Civ.App., 84 S.W.2d 1087. Any other rule will lead to utter confusion because there could be no finality to the order, if subsequent purchasers have a right to appeal. Manifestly, the statutory right to appeal from an order granting the permit to drill an oil well is not an interest or covenant running with the land or an oil lease which will pass by mere assignment of the lease; but such a right is in the nature of a chose in action in favor of the owner of the land or oil lease at the time the Commission heard and determined the right to drill the oil well on the adjacent tract. And by no sort of notice to appellee or the Commission did Yount Lee Oil Company attempt to preserve any right it may have had as owner of the adjacent tract at the time the permit was granted; nor did it attempt to assign to its immediate successor Wright Morrow any right or chose in action it may have acquired as owner and protestant when the permit to drill the well was granted; and manifestly no such right passed to Stanolind, a remote successor in title.

It is also the view of the writer that the very statute (Sec. 8, supra), which authorizes "any interested person affected" by an order or rule of the Railroad Commission to appeal to a court of competent jurisdiction, shows that the Legislature intended to give the right of appeal to the "interested person affected" at the time the order appealed from was entered, because the Legislature provided for all possible haste in determining the matter, as follows: "Such suit shall be advanced for trial and be determined as expeditiously as possible."

The statute clearly states that it is the "interested" person affected by the order who is entitled to appeal, and not some person who may later become interested and affected by the order.

Sec. 11 of said Article 6049c also provides as follows: "After notice and hearing is had upon application for any such injunctive relief either party to said suit has the right of appeal from any judgment or order therein granting or refusing any injunction, whether temporary restraining order, temporary injunction, permanent injunction, or other character of injunctive relief, or from any order granting or overruling a motion to dissolve any such injunction. Said appeal shall at once be returnable to the appellate court and said action so appealed shall have precedence in said appellate court over all cases, proceedings, and causes of a different character therein pending. The provisions and requirements of Article 4662, Revised Civil Statutes of 1925, relating to temporary injunctions shall likewise apply to appeals from any order granting or refusing a temporary restraining order, or granting or overruling a motion to dissolve such temporary restaining order, under the provisions of this Act. In the Court of Civil Appeals such court shall immediately and at as early a date as possible decide the questions involved therein; and in the event any question or questions shall be certified to the Supreme Court, or writ of error thereto be requested or granted, it is here made the duty of the Supreme Court immediately to set down said cause for hearing and decide the cause at as early a date as possible, and such cause shall have precedence over all other causes, proceedings and causes of a different character in such court."

These statutory provisions argue strongly in favor of the contention that the person or party affected was intended to mean the person or party whose interest in the adjacent land or oil lease existed at the time the rule or order complained of was made by the Commission. These statutes require immediate action by both the trial and appellate courts in the determination of the issues raised by such appeal. Manifestly, the legislature did not intend that some future person or party who might subsequent to the order become affected by the rule or order should have a right to then appeal from it. Such a construction would lead to unreasonable delay in the contest of such matters and would greatly jeopardize the interest of the holder of the permit to drill the well, and would render hazardous any

expenditure of money in the drilling of the well.

It is also the view of the writer that if the statute be construed as being broad enough to cover and make subsequent purchasers of an adjacent oil lease an "interested person affected" by a prior order granting a permit to drill an oil well, then under the undisputed facts appellant, Stanolind Oil & Gas Company, is guilty of laches in not instituting its statutory right to contest the permit to drill the well at an earlier date.

Yount Lee Oil Company owned the adjacent lease to the tract on which the order granted the permit to drill the well at the time it was .granted. It was given notice, and a hearing before the Railroad Commission was had, at which it contested the permit to drill the well on appellee's tract of land. The Yount Lee took no appeal from the order granting the permit; nor did it give notice to the Midas that it intended to contest its permit to drill the well. Some 50 days later Yount Lee sold and transferred the lease to Wright Morrow, who, on the same date, in turn sold and transferred the lease to Stanolind. There was no assignment of any chose in action in favor of Yount Lee Oil Company by virtue of the fact that it had appeared before the Board and contested the application for the permit; and although the order granting the permit was made June 10, 1935, the Stanolind Oil & Gas Company, who claimed the right to contest it as the successor to the title of the Yount Lee Oil Company and Wright Morrow, did not file its petition in the District Court of Travis County until October 19, 1935, more than four months after the order granting Midas Oil Company permission to drill the well, and after the Midas Oil Company had spent large sums of money drilling the well and equipping the same; and after it had been operated under order of the Commission for sometime.

The majority recognize the harshness of their rule in declaring that the subsequent purchaser, Stanolind Oil & Gas Company, was entitled to prosecute this appeal as an interested party; but stated that the same was a matter for the legislature rather than the courts. It is true that usually what is a reasonable time is a question of fact; but where the facts are conceded as in the instant case, the question of reasonable time becomes one of law for the court to determine. In determining this question the courts should take notice, and they have taken judicial notice in many cases, that oil is fugitive in its nature; that wells on one tract drain oil from other wells, or from underneath adjacent tracts of land; and have held that negligent delay in bringing an action by one who is affected, or who has some sort of unknown interest, is largely measured by the exigencies of the situation of the parties, the nature and character of the property furnishing the subject matter of the suit or proceeding. It is a matter of common knowledge which courts have universally recognized that in dealing with oil and gas property it requires large expenditures of money to discover and reduce the same to possession; that such property is also fugitive in its nature and subject to drainage under the laws of gravity; and also subject to great fluctuation in value. Such was the holding of this court in Murphy v. Johnson, Tex.Civ.App., 54 S.W.2d 158, writ dis. See also 17 Tex.Jur. 238, and cases there cited. In the Murphy Case this court held that where one sought to establish a secret trust in lands which were productive of oil that he must act with reasonable diligence; and that such a claim or demand, or cause of action became and was stale by reason of any unconscionable delay or neglect in asserting such claim or demand. That a much longer time might be allowed in which to assert some right in regard to real estate whose value is fixed and on which no outlay is made for improvements and but little change in its value takes place, then as to property which is known to be productive of oil and known to be subject to drainage, and known to require large expenditures of money to discover and reduce same to possession. In such case the holder of such a right cannot stand by and permit large expenditures of money to be made and not assert his right. It is true that these principles were laid down with regard to a trust or interest in the land itself; but they should apply to right of one under this appeal statute to control the action of another with regard to the use of his own land with even greater force than when the matter relates to an interest in the land itself. Such is an equitable principle as old as the equitable law itself, and since appellant seeks the equitable relief of injunction to enjoin the drilling of the well in question, equity should deny that relief, since Stanolind and its predecessors stood by more than 4 months without protest or notice to appellee or the Commission, and permitted appellee to expend large sums of money in drilling the well in question.